IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 18, 2017

## STATE OF TENNESSEE v. CHARLES LEE WARNER

**Appeal from the Circuit Court for Rutherford County**
**No. F-72670     David M. Bragg, Judge**

_____

### No. M2016-02075-CCA-R3-CD

_____

The Defendant, Charles Lee Warner, appeals his jury conviction for first degree murder, for which he was sentenced to life imprisonment. In this direct appeal, the Defendant alleges the following errors: (1) that the evidence was insufficient to support his conviction, challenging the evidence establishing his identity and premeditation, and alleging that his jailhouse confession was not sufficiently corroborated; (2) that the trial court erred by declaring Robert Strange to be an unavailable witness and admitting his preliminary hearing testimony; and (3) relying on the rules of evidentiary relevance, that the trial court erred (a) by permitting a law enforcement officer to testify "regarding the [D]efendant's propensity to carry weapons in the past"; (b) by allowing a former employer to testify about murderous threats made by the Defendant to the victim over a year prior to the victim's death; and (c) by prohibiting defense counsel from eliciting testimony "regarding the potentially violent propensities of others known to the witness in the homeless community."[1] Following our review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which, ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Chadwick W. Jackson, Nashville, Tennessee, for the appellant, Charles Lee Warner.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Jennings H. Jones, District Attorney General; and J. Paul Newman, Matthew W. Westmoreland, and John C. Elrod, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] For clarity and ease of discussion, we have combined and reordered the issues as they are set forth in the Defendant's brief.

# OPINION
## FACTUAL BACKGROUND

In May 2014, the victim's nude body was found in Lytle Creek in Murfreesboro. His throat had been slit. Thereafter, the Defendant was charged with the first degree premeditated murder of the victim, Emad Kadhim Al Azraki, and tampering with evidence. See Tenn. Code Ann. §§ 39-13-202, -16-503. Ultimately, the tampering with evidence charge was dismissed, and the Defendant proceeded to a trial by jury on the murder charge, which was held February 8-11, 2016.

A. Discovery of the victim's body and search of the surrounding area. On May 12, 2014, Trey Parsley, a construction worker, was standing on a walking bridge overlooking the greenway area of Lytle Creek when he observed "something kind of shiny" in the creek. Mr. Parsley had been working in the area installing a gas pipeline and had noticed a smell near the bridge for several days that had become more pungent over time. Upon closer observation of the shiny object, Mr. Parsley saw that it was a nude body face-down in the creek. According to Mr. Parsley, the victim's hands appeared to be "out like maybe he was trying to push up or something." Mr. Parsley also observed "sticks and stuff" placed across the victim's back "kind of like in an 'X' maybe . . . to hold him down." Mr. Parsley returned to the bridge and telephoned 9-1-1. When the officers arrived, Mr. Parsley showed them how to get to where the body was "because it was kind of rough to get in in spots." After the officers turned the body over, Mr. Parsley noticed a "big gash" across the victim's neck.

Detective Paul Mongold with the Murfreesboro Police Department ("MPD") responded to Mr. Parsley's call. Detective Mongold determined that the victim's body was found in approximately eight inches of water. Detective Mongold also saw "debris, [] logs, and a board" lying on top of the victim. According to Detective Mongold, it appeared as though the victim was "pinned underneath those logs" and, based upon the condition of the body, it also appeared as though it had been in the water for several days. Collected from the area that day were a blue shirt, a blue and black sleeping bag, a white tank top, and a cigarette butt.

The victim's body was later identified by his wife, Lisa Azraki. She testified that the victim was from Iraq. After viewing several photographs, Ms. Azraki was able to identify the body based upon certain tattoos—one of which was Ms. Azraki's first name with hearts besides it, and another was the name of the victim's nephew.

On May 15, 2014, Detective Mongold returned to the area, searching along the greenway and creek behind Dodge's Store where the victim's body was discovered. He discovered an area under some concrete on the greenway with newspapers and cardboard laid down, believing that may have been where the victim slept. He also found a duffle

bag containing a Verizon phone card and a torn-up piece of paper with the victim's full name on it. On May 21, 2014, Detective Mongold searched the area once more; this time searching the creek downstream from where the victim's body was found, thinking that the current might have carried evidence. He found a white plastic bag with clothes inside that had been submerged in the water. Inside the bag were a pair of blue shorts, a pair of camouflage print underwear, a pair of socks, and a white tank top that was torn and "possibly" had blood on it. The bag was also weighted down with rocks and beer bottles, according to Detective Mongold.

B. Testimony from witnesses acquainted with the Defendant. John Watson testified that he was "in [the Defendant's] company" on the evening of August 23, 2013.[2] On this occasion, Mr. Watson observed the Defendant in possession of "three fixed blade knives on his right side in a sheath."

Mr. Eric Dill testified that he owned a construction "restoration company," and through his work "with a homeless ministry," had hired three homeless individuals during the spring of 2013 to work on a project near Chicago, Illinois. The Defendant and the victim were two of the individuals Mr. Dill had hired. One evening, Mr. Dill and his crew went out to dinner, and while at dinner, the Defendant and the victim, who were both drinking, "had an argument that led to a fight." Mr. Dill maintained that the Defendant punched the victim and threatened to kill him. Although Mr. Dill saw the Defendant in possession of a knife that evening, the Defendant did not use the knife during the argument, according to Mr. Dill.

Because Mr. Dill found the victim to be "very passionate about" the argument with the Defendant, and because Mr. Dill also believed that the Defendant's threat was credible, Mr. Dill decided to send the victim back to Tennessee. So, Mr. Dill drove two and a half hours each way to Chicago, paid for a bus ticket, and placed the victim on a bus.

Three or four days later, Mr. Dill and the Defendant returned to Tennessee. According to Mr. Dill, the Defendant again threatened to kill the victim during the drive home. The Defendant was not intoxicated at the time he made this threat, but according to Mr. Dill, the Defendant "[w]as still angry about the argument" and had "been fuming about [it] for the last several days."

Sixty-year-old Clifford Wayne Brothers testified that the Defendant "showed [him] the ropes" when he became homeless, teaching him how to survive outdoors and to find assistance like "where the Journey Home was, where there's free food, the Salvation

---

[2] Although Mr. Watson was acting in his a capacity as a police officer when he encountered the Defendant on August 23, that information was not relayed to the jury.

-3-

Army and that kind of stuff." Mr. Brothers was eventually able to get his own apartment in Murfreesboro, where he lived in May 2014. According to Mr. Brothers, the Defendant "had a job at the diesel college in Nashville" and lived in the college dormitory, but he would ride his bike or hitchhike to Murfreesboro "every weekend" to visit Mr. Brothers. The Defendant did not stay with Mr. Brothers but would instead "stay at his campsite." However, the Defendant often stored "his gear or equipment" at Mr. Brothers's apartment when he would return to Nashville.

Mr. Brothers became "curious" as to why the Defendant would travel such a "good distance" every weekend. According to Mr. Brothers, the Defendant said that he came to Murfreesboro to look for the man who "had stolen his bike and cut up his tent" and that he intended on hurting the man in "some way." While the Defendant provided a name and said that the man was from India, Mr. Brothers did not know who the man was at that time. Mr. Brothers maintained that the Defendant "was infatuated [with] taking care of this business." Mr. Brothers advised the Defendant to "just drop it" because that occurred "almost six months ago," and they had "different lives now." Mr. Brothers also advised the Defendant that he did not "want to hear any more about it."

Although Mr. Brothers could not recall the exact date, the Defendant eventually informed him "about midday" on "a Friday afternoon or something" in May 2014 that he had located the man who had stolen his bicycle. When Mr. Brothers asked the Defendant what he was "going to do" about it, the Defendant said that he was "going to take care of it." Mr. Brothers again advised the Defendant to "give it a rest." However, according to Mr. Brothers, the Defendant returned to the apartment later that evening with "all this blood on him and had a big cut on him." Mr. Brothers described that the Defendant "had specks [of blood] all over him" and "some soaking blood in his tennis shoes, his shorts, all that kind of stuff." The Defendant also appeared "damp." In addition, Mr. Brothers confirmed that the "big cut" on the Defendant's shoulder was bleeding and that he gave the Defendant "[g]auze and a piece of tape" to help "him close it[.]" At some point, the Defendant also told Mr. Brothers that "he had taken care of his business" with "this guy."

The Defendant told Mr. Brothers that "a truck had hit him on his bicycle," to which Mr. Brothers replied, "[W]ell, you took a pretty good lick if it did." The Defendant asked Mr. Brothers if he could take a shower, and Mr. Brothers said "sure." The Defendant also asked to borrow some clothes. When asked what the Defendant was wearing that day prior to showering, Mr. Brothers responded, "It was a white tank top and a blue pair of shorts. I know it had an emblem. I can't remember the emblem. A pair of white tennis shoes." After showering, the Defendant asked for a plastic bag to put his bloody clothes inside, and Mr. Brothers told him that there were plastic bags underneath the sink. At this time, according to Ms. Brothers, there were several men already inside the apartment and George Lee had also arrived. After retrieving a plastic

bag, "they put the clothes" inside. Mr. Brothers claimed he "didn't want nothing [sic] to do with it." However, Mr. Brothers accompanied the Defendant outside where the Defendant asked him how long he had "known these guys here" and whether they could be trusted.

The Defendant, according to Mr. Brothers, then asked Mr. Brothers to help him look for his glasses on the greenway next to Lytle Creek behind Dodge's Store, the location of the bike wreck. Mr. Brothers testified that he agreed, and the two of them looked for the glasses "[o]n the other side of the creek on the next road over." Mr. Brothers brought a flashlight. When Mr. Brothers inquired about how the glasses ended up twenty or thirty yards away from the roadway, the Defendant replied, "[A]ctually, I came down that breezeway and hit the railing, and my glasses [flew] across the creek" into the "brush" on the other side. Mr. Brothers again said, "[M]an, you took a pretty good lick." While searching, Mr. Brothers was about to sit down when the Defendant said that he "wouldn't sit there" because "[t]hat's where [he] sat down . . . after the wreck, and there might be some blood on it, on the grass." They never found the glasses.

After returning to the apartment from looking for the glasses, Mr. Brothers saw the Defendant's bicycle. However, according to Mr. Brothers, the bicycle "[d]idn't have a scratch on it," and he saw "a little piece of wood in the back that he had his tool box or something on." Upon entering the apartment, there were "three people standing there,"[3] and Mr. Brothers recognized the plastic bag. He told "everybody just get what they need and go" because he was "ready to go to bed." They all left. Mr. Brothers did not see the Defendant again until Sunday afternoon when he returned Mr. Brothers's tent along with a tarp that had a crowbar wrapped inside. The Defendant then left for Nashville. Mr. Brothers claimed that he did not see the Defendant again.

Mr. Brothers was shown a photograph of the bag of clothes recovered from Lytle Creek. He opined that they appeared to be the same clothes the Defendant was wearing that day when he arrived at the apartment covered in blood.

On cross-examination, Mr. Brothers confirmed that he spoke with the police on May 15 and May 16, 2014. However, Mr. Brothers claimed that he had recently had back surgery and "was on muscle relaxers" when he spoke to the police. After reviewing a recording of his police interview, Mr. Brothers acknowledged that he told the police that he refused to help the Defendant go look for the Defendant's glasses. Mr. Brothers further agreed that, during the interview, he described the man that the Defendant was looking for as "either a Mexican or something like that." Mr. Brothers confirmed that he told the police that the Defendant did not appear to "be skinned up that bad" when he

---

[3] From the testimony at trial, we can decisively say that two of these individuals were Mr. Lee and Mr. Strange.

returned in bloody clothes that evening, although Mr. Brothers never mentioned anything about a bike wreck to the police.

Mr. Brothers testified that he did not see the Defendant in possession of a weapon that evening. However, Mr. Brothers "knew [the Defendant] to have knives" because "[h]e was always sharpening" them. According to Mr. Brothers, the Defendant "had some nice knives," which he thought the Defendant may have sharpened on the weekend in question. When asked if he was "certain that it was that weekend or was it another weekend that [the Defendant] might have been sharpening a knife," Mr. Brothers replied, "It was about every time that I saw him," but he was not positive about that weekend.

George Allen Lee testified that he met the Defendant while he was staying at Mr. Brothers's apartment in March or April 2014. Mr. Lee also had known the victim for a few years because he "used to work with him at a water meter place[.]" Mr. Lee described the victim as "a little bitty guy."

Mr. Lee provided many of same details as Mr. Brothers. Mr. Lee confirmed that the Defendant "talked about an individual who stole his bike and his tent" when they "were both living in [a] camp together" and that the Defendant said he "hope[d] to see him one day so he could . . . ask him why he did it." Mr. Lee stated that, while the Defendant did not talk "about it constantly," "it came up a couple times[.]" In addition, one Sunday when Mr. Lee and the Defendant were eating dinner together at the Journey Home, the Defendant pointed out the victim as the individual who had "robbed" him. According to Mr. Lee, the Defendant asked him to go "find out" where the victim was living, but Mr. Lee did not do that because he "could see there was a little bit of animosity there" and he did not "want to get involved[.]"

According to Mr. Lee, he was at Mr. Brothers's apartment on Sunday May 4, 2014,[4] when the Defendant left and returned "a couple of hours" later with "blood on his t-shirt, blood on his pants, and blood on his shoes." Mr. Lee described that there were "dots" of blood, or what looked like "splatter paint," on the Defendant's shirt and a concentration of blood "stuck" on his right shoulder "like he hit something." The Defendant said that he had been involved in a bike wreck.

Mr. Lee testified that, after the Defendant had showered, he emerged from the bathroom with a plastic bag. The Defendant then asked Robert Strange, who was also in the apartment, "to get rid of" the plastic bag, which Mr. Lee assumed contained the Defendant's bloody clothes. According to Mr. Lee, Mr. Strange left with the bag. Because the Defendant did not really "trust Mr. Strange" that much, he asked Mr. Lee to accompany him. Mr. Lee left the apartment and caught up with Mr. Strange, and the two

---

[4] The transcript notes the year as "2015." However, this appears to be in error.

men walked to Dodge's Store. They were looking for a place to throw the bag away and "were going to throw it in the creek," but Mr. Lee saw "a cop car sitting there" and told Mr. Strange not to throw it in the creek. Mr. Lee claimed that he did not want to "get in trouble for littering" and that he "didn't think anything was amiss with it." So, they "walked on around the creek" and to the store. Mr. Lee went inside the store and told Mr. Strange, "[Y]ou do what you need to do with the bag. Put it in the dumpster or whatever." When Mr. Lee exited the store, Mr. Strange did not have the bag anymore. According to Mr. Lee, after they returned to the apartment, the Defendant left.

Mr. Lee believed that he saw the Defendant at Mr. Brothers's apartment the following weekend. According to Mr. Lee, when he saw the Defendant on this occasion, the Defendant asked him "what did Mr. Strange do with the bag[,]" and Mr. Lee told him that he "didn't know." Mr. Lee recalled that the Defendant and Mr. Strange later left the apartment together.

Mr. Lee was also asked if he knew the Defendant to carry any weapons. Mr. Lee said that the Defendant carried a "Rambo knife" or "fixed blade knife" in a sheath on his hip and that the Defendant was in possession of the knife "[e]very time" he saw him. Mr. Lee described the Defendant's knife as a knife with "the little compass on the top," "double edges," and "serrated on one side and like razor on the other side." Mr. Lee stated that he saw the Defendant sharpen the knife twice.

On cross-examination, Mr. Lee explained that the garbage can inside the apartment was full, so regardless, Mr. Strange would have had to "take [the plastic bag] outside anyway." Mr. Lee affirmed that he "didn't think anything bad or sinister" when the Defendant returned bloody to the apartment that evening.

Timothy Ortega testified that he knew the victim "well" and that he also knew the Defendant. When asked if he knew the Defendant "to ever be in possession of a knife," Mr. Ortega responded affirmatively. Mr. Ortega explained that the Defendant "used to wear" "quite a long knife" "on his side." According to Mr. Ortega, "[i]t was a knife that [the Defendant] wore on his side[,] like in a pocket thing or whatnot"; "[i]t wasn't in a case."

Mr. Ortega testified that he remembered Sunday, May 4, 2014, "well." Around midday, Mr. Ortega went to Dodge's Store, bought a beer, and sat in the bushes behind the store where he drank the beer. While sitting there, the victim came "up from underneath the underpass[.]" According to Mr. Ortega, the victim "had some beer and vodka in a water bottle," so they sat on a log and drank and "caught up on old times." They then went to Camino Real restaurant, a place that feeds the homeless. After eating, they decided to come to the town square and panhandle for more money for beer. Sometime after dark that evening, they left the square headed back towards Dodge's

Store when they ran into the Defendant. According to Mr. Ortega, the Defendant and the victim began to have a normal conversation; they were not confrontational. When the victim asked Mr. Ortega if he wanted to hang out with him and the Defendant, Mr. Ortega declined. The Defendant then reached into his backpack and handed Mr. Ortega a beer, and the Defendant and the victim "took off walking" in the direction of Dodge's Store. Mr. Ortega was unsure where exactly the two men were headed.

Mr. Ortega testified that he was supposed to meet with the victim two days later and "go down to Chattanooga because [the victim] was promised work." According to Mr. Ortega, they were scheduled to meet "on that same log" behind Dodge's Store where they had drank together and where the victim had left his "personal property." However, the victim never showed up. Mr. Ortega identified a photograph of the area where the victim had been sleeping.

Mr. Ortega was asked on cross-examination what the "homeless community [was] like in Murfreesboro," and he responded, "It's not all that great." Thereafter, defense counsel probed further:

Q. It's a pretty violent community, isn't it?
A. Pretty much, yes.
Q. You have been assaulted before, haven't you?
A. Of course.
Q. You have been robbed?
A. Yes, sir.

After Robert Strange was declared unavailable for trial, Mr. Strange's preliminary hearing testimony from September 24, 2014, was admitted into evidence. During this testimony, Mr. Strange conveyed that he was twenty-three years old and that he was in custody for a violation of probation on a public intoxication conviction. Mr. Strange stated that he knew both the Defendant and the victim. He was familiar with Defendant because the Defendant rode his bicycle every weekend from Nashville to visit. Mr. Strange recalled that one Sunday evening, in early May 2014, he was outside of Mr. Brothers's apartment hanging out with the Defendant, the victim, and Mr. Ortega.

According to Mr. Strange, he had about three beers that evening; the Defendant was already drinking beer; and the victim was intoxicated. The victim asked the Defendant and Mr. Ortega to accompany him to his motel room at the Imperial Inn, and they agreed. Mr. Strange said that the Defendant and the victim "seemed calm" around each other at that time. In addition, Mr. Strange estimated that it was between 7:30 and 8:00 p.m. when the three men left together because it was dark outside.

-8-

Mr. Strange testified that the Defendant returned to the apartment about an hour to an hour and a half later and was "covered in blood." According to Mr. Strange, he saw blood on the Defendant's clothes, arms, face, and legs. The Defendant asked Mr. Lee for a bag for his clothes and then took a shower. Mr. Strange testified that, thereafter, the Defendant instructed him to throw the clothes in the creek behind Dodge's Store. Mr. Strange said that he and Mr. Lee weighted the bag with bottles and rocks, which was Mr. Lee's idea. Mr. Strange then threw the bag in the creek from the walking bridge.

According to Mr. Strange, he encountered the Defendant a week later on the walking bridge on the greenway near Dodge's Store, and the Defendant asked him to show him where he had thrown the bag into the creek. Mr. Strange also said that the Defendant asked for help with moving a body, and the Defendant instructed him to grab a tarp and crowbar from the Defendant's campsite. Mr. Strange complied. However, before searching, they went to eat at the Journey Home where they saw Cody Simmons. Afterwards, the three men went to look for the bag of clothes but did not find it. They also did not find the body. Mr. Strange said that he did not see the Defendant with a weapon that evening. According to Mr. Strange, he did not go to Mr. Brothers's apartment anymore after this incident. Mr. Strange also testified that he did not go to the police because he "was frightened" of the Defendant.

Cody Simmons testified that he had met the Defendant "a couple of times" and that he interacted with the Defendant several times in May 2014, including once at Mr. Brothers's apartment when he, Mr. Lee, Mr. Brothers, Mr. Strange, and the Defendant were all present. According to Mr. Simmons, the third time he encountered the Defendant was one evening when the Defendant and Mr. Strange "walked up to the Journey Home" for pizza night. Mr. Strange was carrying a tarp. Mr. Simmons described Mr. Strange as acting terrified, and Mr. Strange said that he wanted "to lose" the Defendant. Mr. Simmons joined the two men, and they "walked down the greenway" behind Dodge's Store. According to Mr. Simmons, the Defendant then "pulled a silver gun out on" them and started "waving it back and forth." The Defendant ordered Mr. Strange "to take his boots off and get in the water." Mr. Simmons maintained that they were "looking for something," although he did not know what at the time. Mr. Simmons estimated that they looked for approximately thirty minutes but found nothing. After they were unsuccessful, all three men returned to Mr. Brothers's apartment.

Mr. Simmons testified that he knew the Defendant to carry a knife. According to Mr. Simmons, the Defendant carried a knife "in a sheath on his . . . belt loop." Mr. Simmons agreed that he had never seen the Defendant in possession of a handgun other than on this one evening.

Timothy Davis testified that he met the Defendant while they were incarcerated in the Rutherford County Jail. According to Mr. Davis, they developed a relationship when

the Defendant began to attend a Bible study taught by Mr. Davis. However, at the time of the Defendant's trial, Mr. Davis was no longer incarcerated and was working at a manufacturing job in Franklin, Tennessee. Mr. Davis relayed that he spoke with law enforcement on September 17, 2015, about the Defendant's confession to him and that he was released from the Rutherford County Jail on September 22, 2015.

Mr. Davis recalled that, one day after Bible study, he had a conversation with the Defendant when the Defendant just "started talking to [him] about" the victim's murder. Although the Defendant did not provide Mr. Davis with a name, he told Mr. Davis that the victim had stolen from him twice. The Defendant explained to Mr. Davis that he did not do anything about the first theft, but after the second time, that "God . . . deliver[ed] the man into [the Defendant's] hands." The Defendant said that he asked the man to take a walk with him and that they proceeded to "go walk up the creek bank." While on the creek bank, the Defendant attacked the man, getting on top of him and cutting him with a knife. The Defendant maintained that "the man had asked for forgiveness," but that when the man "said God bless you," the Defendant attacked him. According to Mr. Davis, the Defendant said that the man "pleaded with him or something" and that he cut the man's throat to keep "[t]he man from screaming for help."

The Defendant claimed that a police car drove by during the attack and that the light from the car "illuminated his body[,]" so "he rolled off the man over into the creek." It was during that process that the Defendant lost his glasses. The Defendant then recounted to Mr. Davis how, "after the incident, he went to somebody's house to change clothes," "put his clothes in a bag," and asked someone "to get rid of" them. The Defendant also told Mr. Davis "that the police had a knife, but it was not the knife that he had used." He further conveyed to Mr. Davis that it rained after the attack and "that would have [had] an [e]ffect on the evidence[.]" Moreover, according to Mr. Davis, the Defendant "believed that he wouldn't be convicted[] because God would deliver him." Furthermore, the Defendant expressed to Mr. Davis that he was acting as "a warrior for God."

Mr. Davis recalled being "in shock" by the revelation, and he was uncertain why the Defendant had chosen to confide in him. Mr. Davis thought that the Defendant "appear[ed] to be serious about it[.]"

In addition, Mr. Davis confirmed that he had multiple felony convictions but stated that he had not received any promises from the State in exchange for his testimony against the Defendant. He affirmed that he initially spoke with detectives in hopes of receiving favorable treatment on a failure to appear charge, but none was ever forthcoming. Moreover, Mr. Davis agreed that he helped law enforcement previously "on several cases" and had once been released from jail on a theft charge "to be a cooperating witness" in a federal murder case.

-10-

Mr. Davis also testified that he talked with his cellmate, James Hummer, about the Defendant's confession. According to Mr. Davis, Mr. Hummer advised him to talk with the authorities about what the Defendant had told him.

C. <u>Police Investigation and Forensic Evidence</u>. MPD Detective James Abbott testified that his investigation of the victim's death led him to visit Mr. Brothers's apartment on May 15, 2014. When Detective Abbott arrived, he saw "what appeared to be blood on the wall going up the stairs" and "possible blood" on the door and "door facing." Samples of these stains were collected, according to Detective Abbott.

After knocking on the door, Detective Abbott went inside the apartment and spoke with Mr. Brothers and Mr. Lee, who was also present. Detective Abbott and other officers searched the apartment. Inside a closet, the officers found a tent and a tarp. When the tarp was unfolded, a crowbar was discovered. Along with collecting these items, the officers also collected items from the apartment's bathroom, including a bath mat and several towels, believing that the Defendant showered there after killing the victim.

The Defendant was arrested on May 15, 2014, in his college dormitory room. A sleeping bag was taken from the Defendant's room, and the Defendant's bicycle was photographed. No gun or knife was found. According to MPD Officer Haley Alden, the Defendant "appeared to be calm and unemotional" upon his arrest. Detective Abbott also assisted in taking pictures of the Defendant "a couple of weeks after he had been arrested," possibly "[l]ate May." The photographs depicted "what appeared to be a cut healing on [the Defendant's] right arm."

Buccal swabs were obtained from Mr. Brothers, Mr. Simmons, Mr. Strange, Mr. Lee, and the Defendant. A blood sample and fingerprints were also acquired from the victim's body. Ultimately, none of the evidence collected connected the Defendant or anyone else with the victim's murder.

Dr. Erin Carney testified as an expert in "anatomical, clinical, and forensic" pathology. Dr. Carney performed the victim's autopsy and concluded that the fifty-two-year-old victim's cause of death was "sharp force injuries" or multiple "cutting wounds" and that the manner of death was homicide. Dr. Carney defined sharp force injuries as "injuries that are inflicted by a sharp object, such as a knife or a razor blade or something like that." She opined that the victim "had been assaulted by someone else, maybe more than one person," and confirmed that the wounds were not accidental or self-inflicted and that the victim did not drown. However, Dr. Carney was unable to determine how long the victim was submerged in water before he was found and was unable to render an opinion on the time of death.

-11-

Dr. Carney documented six cutting wounds to the victim's body, which measured five feet and one inch tall and weighed ninety-eight pounds. According to Dr. Carney, the victim sustained a sharp cutting wound across his neck, which measured approximately nine and a half inches in length. Dr. Carney described this wound as a "pretty extensive injury," cutting through the carotid artery, muscles, and bone. She maintained that, after this wound was inflicted, the victim possibly would have still been "moving" and "able" to defend himself, but he would have lost consciousness in "a matter of minutes" and would have died shortly thereafter. Moreover, according to Dr. Carney, "the injury that [she] observed" was "consistent with being caused by a knife." Dr. Carney also saw a second cut on the posterior right neck and scalp. This cut, which measured four inches, penetrated the scalp but not the skull. She also observed a third cut to the victim's right earlobe. This cut was three quarters of an inch in length and separated the victim's earlobe from his face. Also, there were superficial cutting wounds to the right side of the victim's face. In addition, there was a cut to the victim's right ear, which was "a three-quarter V-shaped cutting wound." This cut went through the cartilage into the scalp and muscle. Finally, the victim had a one-inch cutting wound to his left thumb, which Dr. Carney opined was a defensive injury when the victim tried to block a sharp object. Also, an alcohol screen indicated that the victim had been drinking before he died.

D. Defense Proof. The Defendant called James Hummer. Mr. Hummer testified the he shared a cell with the Defendant for three months beginning in July 2014. Mr. Hummer said that sometimes he attended the Bible study group with the Defendant and Mr. Davis. According to Mr. Hummer, the Defendant never confided in him about the details of his case.

On cross-examination, Mr. Hummer confirmed that he also shared a cell with Mr. Davis at some point during his incarceration. Mr. Hummer denied that Mr. Davis ever gave him any details about the Defendant's confession.

E. Verdict, Sentence, and Appeal. Following the conclusion of the proof, the jury found the Defendant guilty as charged. Thereafter, he was sentenced to life imprisonment. The Defendant's timely motion for new trial was denied by the trial court.

The Defendant appealed to this court. However, the Defendant's notice of appeal document was not filed in the clerk's office until October 7, 2016, which would be considered untimely. See Tenn. R. App. P. 4(a) (stating that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from"). The certificate of service indicated that the document was submitted on October 6, 2016, which would be considered timely filed. Nonetheless, it is the file-stamp date, not the assertion of counsel, that controls. See State v. Stephens, 264 S.W.3d 719, 728-30 (Tenn. Crim. App.

-12-

2007). In addition, the State cited these timeliness anomalies in its appellate brief, yet the Defendant failed to address this problem in a reply brief and did not file a motion to waive the timely filing of the notice of appeal. While this appeal could justifiably be dismissed because of the untimely filed notice of appeal, we will forgo this disposition in the interest of justice and address the issues raised by the Defendant due to the gravity of the charge. See Tenn. R. App. P. 4(a) (also providing that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice").

## ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support his conviction; (2) that the trial court erred by declaring Mr. Strange to be unavailable and admitting his preliminary hearing testimony; and (3) that the trial court erred (a) by permitting Officer Watson to testify "regarding the [D]efendant's propensity to carry weapons in the past"; (b) by allowing Mr. Dill, the Defendant's former employer, to testify about murderous threats made by the Defendant to the victim over a year prior to the victim's death; and (c) by prohibiting defense counsel from eliciting testimony from Mr. Ortega "regarding the potentially violent propensities of others known to the witness in the homeless community." We will address each in turn.

### I. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting his first degree murder conviction. Specifically, the Defendant argues that the State failed to prove the Defendant's identity as the perpetrator, failed to establish the necessary element of premeditation, and failed to corroborate the Defendant's jailhouse confession to Timothy Davis. The State counters that the evidence was sufficient to support the Defendant's conviction.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

### A. *Identity*

The identity of the perpetrator is an essential element of any crime. State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing White v. State, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Mr. Davis testified that the Defendant, while they were incarcerated together, confessed to killing the victim. Also, Mr. Brothers testified that the Defendant stopped by his apartment on "a Friday afternoon or something" in May 2014 and stated that he had located the man who had stolen his bicycle and damaged his tent. The Defendant said that he was "going to take care of it." According to Mr. Brothers, the Defendant

returned to his apartment later that evening with blood on him. At some point thereafter, the Defendant also told Mr. Brothers that "he had taken care of his business" with "this guy."

Mr. Brothers recalled that the Defendant was wearing a white tank top, a pair of blue shorts, and white tennis shoes. After the Defendant took a shower, the Defendant asked for a bag in which to put his bloody clothes. Mr. Brothers identified the clothes found in the plastic bag in Lytle Creek as the same clothes the Defendant was wearing that evening. Also, that same evening, the Defendant asked Mr. Brothers for help with locating his glasses, which he had lost on the greenway next to the creek.

Mr. Lee testified that, one evening while he was having dinner with the Defendant at the Journey House, the Defendant pointed out the victim as the individual who stole his bike and damaged his tent. In addition, Mr. Lee said he observed that "there was a little bit of animosity there." Furthermore, according to Mr. Lee, he was at Mr. Brothers's apartment on Sunday May 4, 2014, when the Defendant left and returned "a couple of hours" later with "blood on his t-shirt, blood on his pants, and blood on his shoes." Mr. Lee testified that the Defendant asked Mr. Strange "to get rid of" the plastic bag, which Mr. Lee assumed contained the Defendant's bloody clothes.

Mr. Ortega testified that he remembered Sunday, May 4, 2014, "well" and that, sometime after dark that evening, he and the victim left the town square together headed back towards Dodge's Store when they ran into the Defendant. After Mr. Ortega declined their invitation to accompany them, the Defendant and the victim "took off walking" in the direction of Dodge's Store. The victim never showed up to meet with Mr. Ortega two days later as they had planned.

Mr. Strange recalled that, one Sunday evening, in early May 2014, he was outside of Mr. Brothers's apartment hanging out with the Defendant, the victim, and Mr. Ortega. The victim asked the Defendant and Mr. Ortega to accompany him to his motel room at the Imperial Inn, and they agreed. According to Mr. Strange, the Defendant returned to the apartment about an hour to an hour and a half later and was covered in blood. Mr. Strange testified that, after the Defendant showered, he instructed Mr. Strange to throw the clothes in the creek behind Dodge's Store, which Mr. Strange did. Mr. Strange also said that he encountered the Defendant a week later on the greenway and that the Defendant asked for help with moving a body.

Moreover, the Defendant was known to carry a fixed blade knife, and the victim was cut with a sharp object, possibly a knife. All of this evidence, while circumstantial, was more than sufficient to establish the Defendant as the individual who murdered the victim.

B. *Premeditation*

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)).

Multiple witnesses established a motive for the killing—that the Defendant wanted revenge for the victim's stealing his bicycle and damaging his tent. In addition, those same witnesses testified that the Defendant rode his bike from Nashville to Murfreesboro every weekend in the hope of locating the victim. Mr. Brothers maintained that the Defendant "was infatuated [with] taking care of this business." In early May 2014, the Defendant identified the victim as the perpetrator, and the Defendant was the last person seen with the victim before his death. Moreover, the Defendant had been involved in a previous physical altercation with the victim and had twice threatened to kill the victim. The victim's manner of death, multiple "sharp force injuries," also showed premeditation. The Defendant told Mr. Davis that he cut the victim's throat to keep him "from screaming for help."

When the Defendant returned to Mr. Brothers's apartment that Sunday evening, he was covered in blood. He showered and requested a plastic bag for his clothes. The Defendant then secreted evidence when he ordered Mr. Strange to get rid of the bag. A week later, the Defendant wanted to find the plastic bag and requested help with moving a body from the creek. Detective Mongold also saw "debris, [] logs, and a board" lying on top of the victim's body, seemingly as though to weigh it down. This was sufficient evidence of premeditation.

-16-

## C. *Confession*

Tennessee follows "the long-established common-law rule that a person cannot be convicted of a crime solely on the basis of an uncorroborated extrajudicial confession." State v. Frausto, 463 S.W.3d 469, 479-80 (Tenn. 2015). Our supreme court recently adopted the "modified trustworthiness standard" for determining whether an extrajudicial confession is sufficiently corroborated. State v. Bishop, 431 S.W.3d 22, 58 (Tenn. 2014). Under this standard, a defendant's extrajudicial confession is sufficient to support a conviction if the State presents "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof or loss of injury." Id. (citation omitted). Our supreme court explained:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

Id. at 58-59 (footnotes and citations omitted).

To establish trustworthiness, whether or not the charged offense involved a tangible injury, the independent evidence must corroborate essential facts included in the defendant's statement. Bishop, 431 S.W.3d at 59. Our supreme court explained that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present independent evidence that parallels the defendant's confession or corroborates the defendant's account of what happened immediately before and after the crime." Id. at 60 (internal brackets and quotation marks removed) (citing State v. Weisser, 150 P.3d 1043, 1051-52 (N.M. Ct. App. 2006); State v. Parker, 337 S.E.2d 487, 495 (N.C. 1985)). The court continued, "Another way the State can bolster an extrajudicial admission or confession is by presenting evidence showing that the defendant's statement reveals 'specific personal knowledge about the crime.'" Id. (quoting State v. Mauchley, 67 P.3d 477, 489 (Utah 2003)).

> This sort of personal knowledge can take the form of (1) information provided by the defendant that leads to the discovery of evidence unknown to the police, (2) information about "highly unusual elements of the crime that have not been made public," or (3) information providing "an accurate

description of the mundane details of the crime scene which are not easily guessed and have not been reported publicly" and which are not "the result of suggestion by the police."

Id. (citing Mauchley, 67 P.3d at 489).

In the present case, the State clearly established that the victim suffered a tangible injury. The fact of the victim's murder was undisputed. We note that the Defendant never challenged the corroboration of his confession to Mr. Davis in the trial court. Nonetheless, we conclude that the State established the trustworthiness of the Defendant's confession to Mr. Davis by providing substantial independent evidence corroborating the facts contained in the Defendant's statements. Mr. Davis provided an accurate description of the murder and various details surrounding the crime—for instance, that the Defendant sought revenge after his bike was stolen and his tent was damaged by the victim; that they were walking on the creek bank when the Defendant attacked the victim, getting on top of him and slitting his throat; that the Defendant lost his glasses during the attack; and that "after the incident, [the Defendant] went to somebody's house to change clothes," "put his clothes in a bag," and asked someone "to get rid of" them. These facts were testified to by multiple other witnesses in addition to Mr. Davis. Moreover, the victim sustained a sharp cutting wound to his neck that was approximately nine and half inches in length. Also, the Defendant's clothes were found in a plastic bag in the creek. Although the defense challenged the credibility of the witnesses, credibility was a determination for the jury and did not impact the trustworthiness of the confession. Accordingly, because the Defendant's confession was sufficiently corroborated, he is not entitled to relief. See, e.g., State v. Billy Hill, No. E2015-00811-CCA-R3-CD, 2017 WL 532481, at *28-30 (Tenn. Crim. App. Feb. 9, 2017), perm. app. denied (Tenn. June 7, 2017) (holding that the State established the trustworthiness of the defendant's statements to two witnesses, one a cellmate, by providing substantial independent evidence corroborating the facts contained in those statements).

## II. *Mr. Strange's Preliminary Hearing Testimony*

The Defendant contends that the trial court erred by admitting the audio recording of Robert Strange's preliminary hearing testimony. Specifically, the Defendant argues that the State did not make a good faith effort to obtain Mr. Strange's presence for trial, and therefore, the trial court erred by declaring Mr. Strange unavailable pursuant to Tennessee Rule of Evidence 804(a)(5). Additionally, the Defendant claims that he did not have an opportunity to cross-examine Mr. Strange at the preliminary hearing with the same motives that would have guided his cross-examination of Mr. Strange had he been available at trial. The States replies that the trial court properly determined that Mr. Strange was unavailable and that the Defendant had a similar motive for cross-

-18-

examination at the preliminary hearing, and therefore, the trial court properly admitted the audio recording as an exception to the hearsay rule.

Tennessee Rule of Evidence 804 allows for hearsay testimony of a declarant who is unavailable at trial if the testimony

> [was] given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804(b)(1). Before such testimony will be admitted, however, the proponent must establish that the witness "[i]s absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5).

## A. *Unavailability*

In cases such as the one at bar, it must be shown that the declarant is truly unavailable after good faith efforts to obtain his presence. See Barber v. Page, 390 U.S. 719, 724-725 (1968); see also State v. Arnold, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (citations omitted). The United States Supreme Court stated that "good faith" is defined as "[t]he lengths to which the prosecution must go to produce a witness . . . [and] is a question of reasonableness." Ohio v. Roberts, 448 U.S. 56, 74 (1980), abrogated by Crawford v. Washington, 541 U.S. 36 (2004). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." Id. at 74-75. We will uphold the trial court's determination that a witness is available or unavailable absent an abuse of discretion. See Hicks v. State, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

Furthermore, the party issuing the subpoena has the duty to supervise and ensure that effective service of process is completed. "A party desiring the issuance of process to secure the attendance of a witness has the continuing duty to follow up and supervise the service of the subpoena." State v. Jefferson, 529 S.W.2d 674, 688 (Tenn. 1975), overruled on other grounds by State v. Mitchell, 593 S.W.2d 280 (Tenn. 1980); see also Barber, 390 U.S. at 724. Proof of use of process to procure the attendance of an unavailable witness is required under the Rules of Evidence. Tenn. R. Evid. 804(a)(5).

At the preliminary hearing, Mr. Strange stated that he was originally from Lexington, Kentucky, but was now homeless, and often "hop[ped] back and forth

between friend's houses." Mr. Strange said he was incarcerated on a probation violation, and he testified that he was to be released from custody on January 22. The prosecutor stated his concern that Mr. Strange was homeless and his need to be able to contact Mr. Strange if the Defendant's case went to trial. The prosecutor asked Mr. Strange who "always knows where you are at," and Mr. Strange said his father. Mr. Strange also said that he would provide contact information for his father after the hearing. Multiple subpoenas were issued in 2015 for Mr. Strange's presence at the Defendant's trial.

Prior to the admission of Mr. Strange's preliminary hearing testimony, the State presented Detective Doug Arrington to testify as to the State's efforts to find the homeless Mr. Strange. On January 12, 2016, Detective Arrington located Mr. Strange while he was in the custody of the Coffee County Jail and served a subpoena on him. The subpoena was issued on October 14, 2015. Detective Arrington believed that, at the time he served the subpoena, Mr. Strange would remain in the custody of Coffee County until the Defendant's trial, which began less than a month later on February 8, 2016. However, Detective Arrington confirmed that he did not at that time arrange for Mr. Strange to be transported from the Coffee County Jail to the Rutherford County courthouse. Detective Arrington also testified that he "was worried that this may happen," so when he spoke with Mr. Strange in the Coffee County Jail, he asked Mr. Strange "where he might go." Mr. Strange replied that he did not "know where [he was] going to go" if released. Detective Arrington could not recall if he knew exactly when Mr. Strange was supposed to be released.

On January 27, 2016, Detective Arrington became aware that Mr. Strange had been released from custody "with time served" and had not been placed on probation. Two days later Detective Arrington began to try to locate Mr. Strange. Detective Arrington first contacted Mr. Strange's father who lived in Kentucky, but Mr. Strange's father had no details about Mr. Strange's whereabouts at that time. Detective Arrington also went to the Coffee County Jail and spoke with another detective, who provided Mr. Strange's last known address and information concerning "any known associates of [Mr. Strange's] based on his incarceration in [the] Coffee County Jail." Upon receiving this information, Detective Arrington visited five or six Manchester motels. At those motels, he spoke with employees and residents "in an attempt to see if [he] could find anymore leads about [Mr. Strange's] whereabouts." Detective Arrington was unsuccessful at the motels, so he proceeded to Mr. Strange's "last known address as noted in his arrest report," lot number 68 in a community called Lakewood Estates. Detective Arrington spoke "with some people there at that location," and he also went to the community's "general store and [] bar," speaking with employees and patrons. However, Detective Arrington's efforts once again proved unsuccessful.

In addition, Detective Arrington testified that he "went to the community of home assistance [] in Murfreesboro" and met with several people there who did know Mr. Strange, but they all said that "[t]hey hadn't seen him for a long time." Detective Arrington further affirmed that he had spoken with each of the witnesses in this case that were members of the homeless community and had asked them if they had information on Mr. Strange. They also told Detective Arrington either that "[t]hey hadn't seen [Mr. Strange] in quite a long time" or that Mr. Strange was in the Coffee County Jail unaware of his release.

According to Detective Arrington, he told all of the individuals he spoke with in his quest to locate Mr. Strange to contact him "if they came into contact with [Mr.] Strange or had any information about" his whereabouts. However, he had never been contacted by any of those individuals. Detective Arrington said that he could not "think of any other means" that he could have utilized to contact Mr. Strange. Detective Arrington maintained that he had "put forth a concerted effort to try to locate Mr. Strange."

Following Detective Arrington's testimony and arguments from the parties, the trial court found,

> [T]here has been sufficient proof to show that the State has made diligent effort, not only by serving the subpoena on Mr. Strange and making him aware of his required presence . . . , but also in making all those contacts and spending that time trying to find Mr. Strange so that he would be available for trial.

The trial court concluded, "Mr. Strange is unavailable based upon his absence . . . . And the proponent of the statement has been unable to secure his attendance by process or diligent efforts to locate him."

The Defendant argues that the trial court erred in finding that Mr. Strange was "unavailable" because the State failed to establish that it made a good faith effort to locate Mr. Strange. The Defendant notes that the State "was well aware of [Mr. Strange's] transient nature"; that the State failed to maintain contact with Mr. Strange for sixteen months after the preliminary hearing until "fortuitous[ly]" locating him in the Coffee County Jail on January 12, 2016; that Detective Arrington "did not even attempt to ascertain Mr. Strange's release date from the Coffee County Jail and failed to make any effort whatsoever to assure that [Mr. Strange] would be transported from Coffee County to Rutherford County to testify had he remained in custody"; and that "no one for the State chose to exercise the use of a Material Witness Bond to secure [Mr. Strange's] appearance at trial."

-21-

In his brief, the Defendant intently focuses on the State's efforts to locate Mr. Strange during the sixteen months before Detective Arrington served Mr. Strange with a subpoena in the Coffee County Jail on January 12, 2016. Fortuitous or not, Mr. Strange was located by Detective Arrington and served with process. Not only was there proof of the use of process to procure Mr. Strange's attendance at trial, but he was actually served with process less than one month before the Defendant's trial was to begin and was aware that his presence was required. Accordingly, only Detective Arrington's efforts after January 12, 2016, to follow up and supervise the service of the subpoena are relevant.

Moreover, the Defendant cites to State v. Armes in support of his argument. See 607 S.W.2d 234 (Tenn. 1980). In Armes, the State attempted to subpoena the witness before trial and discovered that the witness had disappeared. Id. at 236. This disappearance resulted in a mistrial. Id. One week before the second trial and again one day before the second trial, the State attempted to subpoena the witness. Not surprisingly, the State was unable to locate the witness. Id. At trial, the State attempted to present the testimony of the witness at the preliminary hearing. Id. To prove the witness's unavailability, the State failed to provide any independent evidence of an attempt to locate the witness other than a statement by the prosecutor. Our supreme court stated, "The prosecuting attorney's statement to the [c]ourt concerning the efforts of the State's investigator to locate the witness cannot be considered as evidence of proof on the issue of the State's good faith effort." Id. at 237. Our supreme court also stated that the State was on notice that extra effort would be required to locate the witness because he did not appear for the first trial date. Id.

However, unlike Armes, the State provided independent evidence of its efforts to locate Mr. Strange. Detective Arrington testified that he believed that Mr. Strange would remain incarcerated until the Defendant's trial. Detective Arrington learned two weeks later on January 27, 2016, that Mr. Strange had been released from custody. Thereafter, Detective Arrington contacted Mr. Strange's father, went to the Coffee County Jail and Mr. Strange's last known address, visited local motels and a home assistance community in Murfreesboro, and interviewed the witnesses in this case who were members of the homeless community concerning Mr. Strange's whereabouts. Detective Arrington searched for Mr. Strange through the resources he had but to no avail. Based upon this evidence, we cannot conclude that the trial court abused its discretion by finding that the State made a good faith effort to find Mr. Strange and that he was, therefore, unavailable at trial. See, e.g., State v. Bobby Jackson, No. W2009-02232-CCA-R3-CD, 2011 WL 1849096, at *7 (Tenn. Crim. App. May 11, 2011) (concluding that the State established that it had made a good effort to find a unavailable witness when the State presented testimony from one individual that the unavailable witness planned to return to Mexico and that he had attempted to locate the unavailable witness in Mexico by calling the number the witness had given him, and from a detective that he had gone to the local

address that the unavailable witness had provided but no one knew where the witness had gone); State v. Innocent S. Nzamubereka, No. E2009-00755-CCA-R3-CD2011 WL 255368 (Tenn. Crim. App. Jan. 20, 2011) (holding that the record supported the trial court's finding that the witness was unavailable when the trial court relied upon the subpoena in the court file, which showed that the witness had been served to appear at trial, and heard credible testimony from three other witnesses regarding the State's good faith efforts to have the unavailable witness appear and testify at trial).

## B. *Similar Motive*

The Defendant also submits that the type of cross-examination conducted at a preliminary hearing is different from that conducted at trial. He states that the "motive" for cross-examination at the preliminary hearing "is not to engender reasonable doubt in the mind of the listener/juror like the trial standard of proof beyond a reasonable doubt, but rather to investigate the merits of the case and conduct as much fact-finding as possible under a probable cause standard[.]" He continues, "Counsel's opportunity to attack the credibility of the witness is limited since credibility is not the main issue and probable cause is a very low standard of proof." Additionally, he notes that the defense lacks the benefit of discovery materials at the preliminary hearing and that such materials are necessary to "affect a full and meaningful cross-examination of a witness[.]"

Courts of this state have consistently upheld the admission of testimony from a preliminary hearing when the defendant had an opportunity to cross-examine a witness who was subsequently deemed unavailable. See, e.g., State v. Davis, 466 S.W.3d 49, 69 (Tenn. 2015) (affirming the admission of preliminary hearing testimony and a prior statement of a testifying witness as substantive evidence where that witness testified at trial that he could not remember giving the statement or testifying at the preliminary hearing, so he was declared to be "unavailable," and the defendant had the opportunity to cross-examine the witness on the subject); State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993) (concluding that, because previous counsel at out-of-state preliminary hearing had "similar motive" to cross-examine a witness, the admission of the testimony did not violate the defendant's right to confront witnesses); State v. Bowman, 327 S.W.3d 69, 89 (Tenn. Crim. App. 2009) (concluding that "preliminary hearing testimony was admissible under the 'former testimony' hearsay exception of Rule 804(b)(1) and . . . did not violate the defendant's rights under the Confrontation Clause."); State v. Brian Roberson, No. E2013-00376-CCA-R3-CD, 2014 WL 1017143, at *6-7 (Tenn. Crim. App. Mar. 14, 2014) (holding that the defendant had a similar motive to develop the testimony at the preliminary hearing as he would have had at trial, and that the preliminary hearing cross-examination was sufficient to meet the requirements of the Confrontation Clause); State v. Edward Warren Wise, No. M2012-02129-CCA-R3-CD, 2013 WL 4007787, at *5-6 (Tenn. Crim. App. Aug. 6, 2013) (concluding that preliminary hearing testimony was

admissible because there was a similar motive to develop the testimony and because the defendant engaged in thorough cross-examination); State v. Brian Eric McGowen, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *11-12 (Tenn. Crim. App. Aug. 18, 2005) (holding that the trial court did not err in allowing preliminary hearing testimony to be introduced at trial under the former testimony exception because the motive to cross-examine the defendant was the same at both the preliminary hearing and trial).

Likewise, this court has rejected the claim that cross-examination at the preliminary hearing was insufficient due to differences in the nature of the proceedings, including the burden of proof. See Howell, 868 S.W.2d at 251 (holding that a preliminary hearing testimony of a declarant could be introduced at trial under the former testimony exception based primarily on a finding that "at both the [preliminary] hearing and the subsequent trial, the testimony was addressed to the same issue of '[w]hether or not the defendant[] had committed the offense' charged") (quoting State v. Causby, 706 S.W.2d 628, 632 (Tenn. 1986))); State v. Michael James Grubb, No. E2005-01555-CCA-R3-CD, 2006 WL 1005136, at *5-7 (Tenn. Crim. App. Apr. 18, 2006) (rejecting claim that "the type of cross-examination conducted at a preliminary hearing is different from that conducted at trial" and concluding that the defendant had the opportunity to cross-examine the witness "at the preliminary hearing with the same motives that would have guided his cross-examination of the declarant had he been available at trial"). "A preliminary hearing transcript is precisely the type of former testimony contemplated under [Rule 804(b)(1)]." Bowman, 327 S.W.3d at 88-89 (internal quotations omitted).

Regarding the Defendant's argument concerning a lack of discovery materials at the preliminary hearing, in State v. Robert Echols, the defendant raised a similar argument, asserting that because discovery was not mandated and identification standards were more "lax" at the preliminary hearing, admission of the victim's testimony at trial violated his right to confront witnesses. No. W2013-02044-CCA-R3-CD, 2014 WL 6680669, at *13 (Tenn. Crim. App. Nov. 26, 2014). This court rejected the defendant's argument under a plain error analysis, concluding that the defendant's motive for cross-examining the victim at the preliminary hearing was "similar" to the motive for cross-examining him at trial, i.e., "to negate the [d]efendant's culpability for the offense charged," and that the defendant's counsel in fact effectively challenged the victim's identification in various ways on cross-examination. Id. at *15. Similarly, in State v. Christopher Terrell Shipp, this court rejected the defendant's argument that he did not have a similar motive or adequate opportunity to cross-examine the witness because he did not have access to her prior statement regarding the facial tattoo at the time of the preliminary hearing. No. M2016-01397-CCA-R3-CD; 2017 WL 4457595, *5-7 (Tenn. Crim. App. Oct. 5, 2017), perm. app. denied (Tenn. Feb. 14, 2018).

-24-

We decline to depart from this plethora of caselaw. In accord, we reject the Defendant's arguments and conclude that the Defendant had an opportunity and similar motive to cross-examine the witness at the preliminary hearing. While the prior cross-examination may not have been "to whatever extent, the defense might wish," the Defendant was presented with, and availed himself of, "an opportunity for effective cross-examination." Davis, 466 S.W.3d at 68 (quoting Owens, 484 U.S. at 559-60). We conclude that Mr. Strange's testimony was properly admitted under Tennessee Rule of Evidence 804.

### III. *Relevant Evidence*

The Defendant, relying on the rules of evidentiary relevance, argues that the trial court erred (1) by permitting Officer John Watson to testify "regarding the [D]efendant's propensity to carry weapons in the past"; (2) by allowing Eric Dill to testify about murderous threats made by the Defendant to the victim over a year prior to the victim's death; and (3) by prohibiting defense counsel from eliciting testimony from Mr. Ortega "regarding the potentially violent propensities of others known to the witness in the homeless community." The State responds that the trial court acted within its discretion.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

Tennessee Rule of Evidence 404(b) generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." State v. Jones, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. Id. The rule sets out certain procedural requirements the trial court must follow:

(1) The court upon request must hold a hearing outside the jury's presence;

-25-

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The comments to Rule 404(b) provide that evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of the defendant, such as identity, motive, intent, or absence of mistake. Jones, 450 S.W.3d at 891; see also Tenn. R. Evid. 404, Advisory Comm'n cmt. A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." DuBose, 953 S.W.2d at 652.

### A. *Officer John Watson*

The Defendant argues that Officer Watson's testimony that the Defendant was seen in possession of three fixed blade knives on August 23, 2013, was irrelevant and that, even if relevant, the probative value of his testimony was outweighed by the danger of unfair prejudice. In support of his argument, the Defendant remarks that "the prior event was [nine] months prior to [the victim's] death and there [was] no direct evidence that the weapon [the Defendant] was alleged to have possessed at that time was used" in the killing. The Defendant notes that no one testified that the Defendant was in possession of a knife the night of the alleged murder and that the pathologist testified that the injuries were "sharp force injuries" "caused by a knife, or razorblade or similar sharp object." Furthermore, the Defendant maintains that "any attempt at cross-examination to mitigate or negate the impact of [Officer] Watson's testimony would have only led defense counsel into a thicket of testimony about the true nature of the interaction that night with [Officer] Watson in his official capacity as a police officer[.]" The State replies that the trial court properly admitted the evidence because "such testimony was relevant to the State's theory that the victim died of injuries inflicted by a knife or razor blade and that the [D]efendant carried a knife."

At trial, outside of the jury's presence, defense counsel moved to exclude Officer Watson's testimony raising a relevancy objection. Defense counsel first acknowledged the trial court's previous ruling at a pretrial hearing that possession of knives on any given occasion did not qualify as "a bad act" and was, therefore, not prohibited by Rule 404(b). Defense counsel then noted that the Defendant was ultimately arrested for aggravated assault and possession of a prohibited weapon on the evening August 23,

2013, the night that Officer Watson encountered the Defendant and saw him in possession of the three knives. According to defense counsel, "the interaction itself with law enforcement [would] leave[] the jury to draw an inference that there was some sort of bad or nefarious act that was going on" that evening. In addition to noting that the testimony would come from a law enforcement officer, defense counsel noted that Officer Watson's August 23, 2013 observation did not occur "in close proximity" to the alleged murder on May 3, 2014; that no one would testify that the Defendant had a knife on the evening in question; and that there were "other lay witnesses" who could testify that the Defendant carried a knife, which would be "less prejudicial[.]" Defense counsel further maintained that he would not be able to effectively cross-examine Officer Watson or the aggravated assault victim, Norman Ogden, if he was called to testify, because any questioning on defense counsel's part would lead to prejudicial evidence coming in against the Defendant—like the prior aggravated assault and the large size of the knife. In conclusion, defense counsel surmised, "So, therefore, it's not relevant to say that [the Defendant] has knives on these other occasions in this circumstance when law enforcement is involved and a prior crime is involved."

The prosecutor replied, "Your Honor, it is the cumulative effect of us showing that [the Defendant] normally carried a knife. He carried a knife in 2013. He carried a knife on several instances in 2014." The prosecutor noted that Officer Watson was dressed in a suit and was not wearing a uniform, that Officer Watson would limit his testimony to saying "that on that particular occasion he did see [the Defendant]" and that the Defendant "did have in his possession knives"; that Officer Watson would not be asked about the Defendant's arrest; and that Mr. Ogden was not going to be called as a witness. The prosecutor concluded, "I'm just trying to establish that there is a pattern that [the Defendant] carries a knife. And [Officer Watson] is the first one in that link."

The trial court denied the Defendant's motion and permitted the State to call Officer Watson. In so ruling, the trial court reasoned: "The [c]ourt previously ruled that possession of a knife is not a bad act, and . . . would be admissible. The [c]ourt sees no reason to change based on what it's heard this morning, and would allow the officer to testify."

Prior to Officer Watson's trial testimony, defense counsel requested that the State "not elicit his title and rank and occupation." The prosecutor agreed with defense counsel's request and further relayed that he would instruct Officer Watson "not to say where he's employed." Thereafter, Officer Watson's entire testimony was as follows:

Q. . . . Mr. Watson, I want to take you back to the night of August 23rd, 2013. On that particular occasion, were you ever in the company of the Defendant in this case . . . ?
A. Yes, sir, I was.

Q. And while you were in his company, did you ever have an occasion to see him in possession of any type of knives?
A. Yes, sir.
Q. And can you tell us about those knives?
A. [The Defendant] had three fixed blade knives on his right side in a sheath.
Q. And he had them inside of a sheath?
A. Yes, sir.

The defense chose not ask Officer Watson any questions.

Our supreme court has expressly rejected the Defendant's argument in State v. Reid, 213 S.W.3d 792 (Tenn. 2006). In that case, Reid's former employer testified that, shortly after the crimes, Reid possessed a small caliber, automatic handgun and a double-bladed knife. Id. at 813. In affirming this court's conclusion that "the trial court did not err by admitting the testimony, reasoning that the evidence was relevant and not prohibited by Tennessee Rule of Evidence 404(b) because the possession of a weapon is not necessarily a crime or wrongful act[,]" our supreme first cited to similar holdings from other jurisdictions:

Other jurisdictions have ruled similarly in these circumstances. For example, in Busey v. United States, the Court of Appeals for the District of Columbia ruled that "testimony that Busey possessed a revolver that might have been the murder weapon was not admitted improperly to establish criminal propensity. That evidence was directly relevant . . . because it constituted evidence supporting the charge that Busey was the person who" committed the crimes charged. 747 A.2d 1153, 1165 (D.C. App. 2000). That court has also ruled that "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." Coleman v. United States, 379 A.2d 710, 712 (D.C. App. 1977). Similarly, in People v. Houston, the Michigan Court of Appeals determined that proof that Houston had possessed a .380 handgun three days before the victim was murdered with the same caliber weapon "was directly relevant to identifying defendant as the killer," concluding that the evidence was not inadmissible under Rule 404(b) because the "mere possession of a pistol is not a crime." 683 N.W.2d 192, 195-96 (Mich. Ct. App. 2004). In Williams v. State, the Indiana Supreme Court observed that "[i]t is by no means clear that weapons possession, evidence of gun sales, and the like, are necessarily prior 'bad acts' for 404(b) purposes." 690 N.E.2d 162, 174-75 (Ind. 1997). Finally, the Maryland Supreme Court has also agreed that the defendant's

possession of guns or ammunition does not qualify as a bad act under the evidentiary rules. Klauenberg v. State, 735 A.2d 1061, 1073 (Md. 1999).

Id. at 813-14. Then, relying on this jurisprudence, our supreme court concluded that trial court properly admitted the testimony from Reid's former employer, reasoning: "In our view, the ownership of these weapons, standing alone, does not constitute a crime. The testimony that [Reid's employer] saw [Reid] in the possession of weapons similar to those used in the crimes did not necessarily constitute evidence of a bad act. Because of the weapons' similarity to those described by the victim [], the evidence was especially probative as to the identity of the perpetrator." Id. at 814.

Reid controls here. Officer Watson was not in uniform when he testified, and during his testimony, he made no mention of his employment or in what context he encountered the Defendant on August 23, 2013. From all appearances, Officer Watson appeared to be nothing more than a lay witness. Also, Mr. Ogden, the victim of the aggravated assault, was not called to testify. Officer Watson's testimony was extremely brief, and the defense was not precluded from cross-examining Officer Watson, although the decision not to do so was understandable. The defense was able to successfully exclude any prejudicial information prior to Officer Watson's testimony.

In addition, the Defendant's former employer testified that the Defendant was in possession of a knife in the spring of 2013. The Defendant's associates also testified that the Defendant frequently carried a knife. Mr. Brothers testified that he "knew [the Defendant] to have knives" and that the Defendant had a knife "about every time that [he] saw him." Mr. Lee testified that the Defendant carried a "Rambo knife" or fixed blade knife with "double edges[,]" "serrated on one side and like razor on the other side." Mr. Lee also said that the Defendant carried the knife in a sheath on his hip. According to Mr. Lee, "[e]very time [he] saw [the Defendant, the Defendant] had it." Mr. Ortega testified that the Defendant carried "quite a long knife" "on his side[,] like in a pocket thing or whatnot." Mr. Simmons also testified that the Defendant carried a knife "in a sheath on his . . . belt loop." The State used this testimony to establish that the Defendant had a pattern of carrying a knife similar to one possibly used to kill the victim.

The pathologist testified that the victim's cause of death was "sharp force injuries" or multiple "cutting wounds." The pathologist defined sharp force injuries as "injuries that are inflicted by a sharp object, such as a knife or a razor blade or something like that." Moreover, according to the pathologist, "the injury that [she] observed," was "consistent with being caused by a knife."

The testimony that the Defendant frequently possessed a knife in the days, weeks, months, and even the year, leading up to the victim's murder that might have been the murder weapon was not admitted improperly to establish criminal propensity. Instead,

-29-

the evidence was directly relevant because the evidence was especially probative as to the identity of the perpetrator. We conclude that the trial court did not abuse its discretion by permitting Officer Watson to testify that he observed the Defendant with three fixed blade knives on August 23, 2013. See, e.g., State v. Lamantez Desha Robinson, No. M2016-02335-CCA-R3-CD, 2017 WL 4693999, at *7-8 (Tenn. Crim. App. Oct. 18, 2017), perm. app. denied (Tenn. Feb. 14, 2018) (concluding that a photograph of the defendant holding two handguns was not offered as propensity evidence but to establish the defendant's identity as the shooter because the photograph tended to make it more likely that the defendant was in possession of the weapon used to shoot the victim).

## B. *Eric Dill*

The Defendant contends that Mr. Dill's testimony "should have been excluded because the State was unable to establish how a [fourteen]-month-old threat following an argument and fight between [the victim] and the Defendant established any settled intent or motive on the part of the Defendant to kill [the victim.]" He extrapolates that Mr. Dill's testimony was irrelevant because it "did not have any tendency to make the existence of the State's assertion that the Defendant killed [the victim] more probable than it would be without the evidence." The State responds that the trial court properly admitted Mr. Dill's testimony that the Defendant threatened to kill the victim twice approximately fourteen months before the victim's murder "because it was relevant to show the [D]efendant's motive and intent to kill the victim."

Prior to Mr. Dill's trial testimony, a jury-out hearing was held. After hearing testimony from Mr. Dill, the trial court determined as follows:

> [F]irst, the evidence is clear and convincing that there was an altercation outside in the parking lot. That it reached the level to where, based on the safety of those involved and his company's reputation, Mr. Dill sent one of the people back home. That he continued to work for a couple more days, and then even two or three days after the event, the threat was repeated.

> And the court finds that to be probative. Finds it to be probative as to motive, as well as to intent at some level. And would find it to be more probative than prejudicial. And, therefore, would find it to be admissible.

> I find that it is not outweighed by the danger of unfair prejudice. However, I would note that there is to be no discussion or inquiry, unless

-30-

the [d]efense wants to go into it, as to what was the basis of the altercation or any discussion related to some allegation that led to the altercation.[5]

Here, the trial court substantially complied with the procedural requirements of the Rule 404(b).

Turning to the merits of the Defendant's argument, our supreme court, in State v. Smith, has held that prior acts of violence and prior threats against a victim were "admissible under Rule 404(b) because the evidence [was] relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008) (holding that evidence of the defendant's prior assaults of the victim fits established the violent nature of their relationship and the defendant's hostility toward the victim); State v. Turnbill, 640 S.W.2d 40, 47 (Tenn. Crim. App. 1982) (providing that the "prior relations between the victim and the appellant were relevant matters for the jury's consideration on the question of the appellant's intent"). The Smith court reasoned that "evidence of these violent episodes was admitted not to prove the [d]efendant acted in accord with this character but as part of the proof establishing his motive for the killings" and determined that the probative value of the evidence was not outweighed by the danger of unfair prejudice. 868 S.W.2d at 574 (citations omitted).

Here, the Defendant was indicted for first degree premeditated murder, and the State's theory was that the murder was accomplished by luring the victim to the creek bank and cutting his throat with a knife. The State had to prove that the Defendant intended to kill the victim and did so with premeditation. See Tenn. Code Ann. § 39-13-202(a)(1). The trial court determined that the Defendant's prior altercation with the victim and corresponding threats were relevant to establish motive and the Defendant's intent to kill the victim. The trial court also determined that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The evidence established the volatile nature of their relationship and the Defendant's hostility toward the victim. In our view, this evidence fits squarely within the Smith rule. See Gilley, 297 S.W.3d at 758.

The crux of the Defendant's argument is that the prior altercation and threats were too remote in time to be admissible, occurring approximately fourteen months before the victim's murder. However, "remoteness affects only the weight, not the admissibility of the evidence." State v. Kiser, 284 S.W.3d 227, 291 (Tenn. 2009) (quoting Smith, 868 S.W.2d at 575. Here, the State sought to establish through this evidence that the

---

[5] The victim had accused the Defendant of having sex with a fourteen-year-old girl. No mention of this accusation was made at trial.

Defendant had a settled purpose to harm the victim, and we note that the prior altercation and threats were not overly remote. Any issue regarding the remoteness of the evidence went to its weight and not to its admissibility. Accordingly, we conclude that the trial court did not abuse its discretion by allowing Mr. Dill to testify that the Defendant and the victim were involved in a prior altercation and that the Defendant twice threatened to kill the victim in April or May of 2013. See State v. Christopher Brown, No. W2015-00990-CCA-R3-CD, 2016 WL 1446221, at *8-9 (Tenn. Crim. App. Apr. 12, 2016), perm. app. denied (Tenn. Sept. 22, 2016) (rejecting the defendant's contention that an October 2011 assault on his girlfriend was "too remote" to be relevant to the issue of his intent on the night of June 22, 2013, when he approached an SUV in which his girlfriend and three others were riding and shot multiple times into the vehicle; determining that "the relationship between the parties was squarely at issue during the trial" and noting that the trial court weighed the probative value of the evidence against the prejudice to the defendant and found that the evidence was not "particularly prejudicial"); State v. Warner Conrad Bias, No. E2007-01452-CCA-R3-CD, 2009 WL 3817291, at *14-16 (Tenn. Crim. App. Nov. 16, 2009) (allowing evidence of a 1997 order of protection and previous threats made by the defendant toward the victim and her family to be admitted when the victim was killed in March 2001; holding that the evidence was probative of both the defendant's motive and intent and to rebut his theory of self-defense and lack of premeditation and that, although the evidence was prejudicial, its probative value was not outweighed by the danger of unfair prejudice).

## C. *Homeless Community*

The Defendant complains that the trial court erred by limiting his cross-examination of Timothy Ortega "regarding potentially violent propensities that exist among the homeless community and other acts of violence committed by others in the same community." According to the Defendant, the trial court "abused its discretion by not allowing the questions to continue or, in the alternative, . . . conduct[ing] a jury-out hearing to explore the relevance of the questions and their potential answers[.]" The Defendant contends that Mr. Ortega's testimony was relevant based upon the testimony of the pathologist "that there could have been other assailants[,]" that "it was not hearsay or improper character evidence to discuss other acts or crimes that had been directly witnessed by Mr. Ortega[,]" and that it "would not have been evidence regarding reputation or character of other witnesses or their credibility." The State responds that the Defendant "cannot demonstrate [that] Mr. Ortega's testimony was relevant to the victim's murder and established an alternative suspect who may have killed the victim," and moreover, that he has "failed to show 'manifest prejudice' in limiting Mr. Ortega['s testimony] about other crimes [Mr. Ortega] witnessed while a member of the homeless community."

Prior to trial, on December 12, 2014, the State filed a motion in limine "regarding alternate suspects," requesting that the trial court order defense counsel and any witness for the defense

> not to allude to, refer to, or state or ask any question bearing on the topic that another person other than the [D]efendant, committed, may have committed, or was a suspect, in the instant offense, or offer any opinion on said topic areas, in the presence of the jury without there first being an offer of proof of said evidence, and a [c]ourt ruling made outside of the presence of the jury allowing same into evidence.

In support of its motion, the State cited the following Tennessee Rules of Evidence: (1) Rule 402 "because the evidence is not relevant"; (2) Rule 403 because its probative value is substantially outweighed by any danger of unfair prejudice; (3) Rule 404 because it is improper character evidence; (4) Rule 602 because there must first be "evidence introduced sufficient to support a finding that the witness has personal knowledge of the matter"; (5) Rule 608 regarding the limitations on impeaching the credibility of a witness; (6) Rule 701 because it "may be improper lay opinion"; and (7) Rule 802 because it "may be inadmissible hearsay." The trial court filed an order on May 18, 2015, stating that a hearing on this motion and multiple other motions, which included arguments from counsel, was held on May 1, 2015. In the order, the trial court ruled that, "[p]ursuant to [the] agreement of the parties," the motion in limine "regarding alternative suspects" was granted, as were many other motions.

After Mr. Ortega testified on cross-examination at trial that the "homeless community" in Murfreesboro was "not all that great" and that he had been assaulted and robbed before, the prosecutor objected on relevancy grounds. At the bench conference that ensued, defense counsel argued, "[I]f they are going to paint [the Defendant] as being the only aggressor around here, then the jury needs to hear that it's in general a violent community." The prosecutor noted that the "alternate suspect" motion had been dealt with in a pretrial hearing and argued that, if the defense was "going to raise anything about alternate suspects under the case law," then the defense had "to have more than just suspicion that somebody else would have done it." Defense counsel explained that he was not identifying a "specific subject" and continued: "Because their theory that if [the victim] was murdered, then probably . . . anybody's hand could do it." The trial court then summarized the complained of portion of Mr. Ortega's testimony and observed that the defense's "point" that it was "a violent community" had been made. The trial court continued, "I don't see any relevance in continuing to talk about any specific incidents or acts of violence that's not the subject of this trial. And then if you get into that, you're going to be looking at the alternative suspect theory discussed before." When defense

-33-

counsel was asked if he "plan[ned] on exploring the nature of the homeless community any further," he said, "No, I do not."

The prosecutor then cautioned the trial court and defense counsel that, if Mr. Ortega was "push[ed] . . . too much," then Mr. Ortega may reference the August 23, 2013 event where he witnessed or knew that the Defendant pulled a knife on Norman Odgen and which also involved Officer Watson. Defense counsel said, "Okay." The trial court admonished the defense not to pursue further questioning about the violent nature of the homeless community, again a point that had already been established, unless there was a reason that additional questions were relevant. Defense counsel again said, "[O]kay." The trial court ruled that Mr. Ortega's testimony could stand but warned, "[I]f the State raises a relevance question again to that line of questioning, I'm probably going to . . . sustain the objection." That concluded the bench conference.

In light of this procedural history, we conclude that plenary review of the Defendant's issue is waived. The Defendant has failed to include a transcript or copy of the May 1, 2015 hearing in the record on appeal. During this hearing, it appears that the defense agreed to terms of the State's motion in limine "regarding alternate suspects." Without a transcript, we cannot know what, if any, specific evidence was addressed at the hearing and what, if any, arguments of the parties on the subject were addressed. It is the Defendant's duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of the appeal." Tenn. R. App. P. 24(b).

Moreover, in the State's pretrial motion, it was the State who requested a jury-out hearing prior to the admission of any such testimony "that another person other than the [D]efendant, committed, may have committed, or was a suspect, in the instant offense, or offer any opinion on said topic areas[.]" From the trial court's order, it appears that the defense agreed to the request. At trial, when the defense began to potentially delve into this topic during its cross-examination of Mr. Ortega, the State objected on relevancy grounds, and defense counsel asked for a bench conference. During this bench conference, however, defense counsel never made a request for a jury-out hearing. Accordingly, we agree with the State that to the extent the Defendant is claiming on appeal that he was denied the chance to make an offer of proof on what further questioning would have shown, this claim is waived. Most importantly, defense counsel stated during the bench conference that he, in fact, had no additional questions for the witness "about the nature of the homeless community[.]" See Tenn. R. App. P. 36(a) (stating that relief is not required if the party seeking it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error"); Gilley, 297 S.W.3d at 762 ("The failure to make a contemporaneous objection constitute[s] waiver of the issue on appeal.").

In addition, the trial court allowed Mr. Ortega's testimony to stand and correctly noted that the defense had established its "point" that the homeless community was a "violent" place. On appeal, the Defendant argues that Mr. Ortega's testimony about other specific acts or crimes by others in the homeless community was relevant because of the violent nature of that community and the pathologist's testimony "that there could have been other assailants." Initially, we note that Mr. Ortega was permitted to testify that he had been robbed and assaulted before. Besides, in State v. Larry Scott Reynolds, this court held that evidence to establish that someone other than the defendant is the guilty party must be relevant in the trial of the third party and must be limited to such facts as are inconsistent with the defendant's guilt and that raise a reasonable inference or presumption as to the defendant's innocence. No. M2009-00185-CCA-R3-CD, 2010 WL 5343305, at *30 (Tenn. Crim. App. Dec. 16, 2010) (citing Hensley v. State, 28 Tenn. (1 Hum.) 243 (1848)). "To be admissible, the evidence must be such proof that directly connects the third party with the substance of the crime[] and tends to clearly point out someone besides the accused as the guilty person." Id. (citation omitted). Because the Defendant's speculative assertion about members of the homeless community would have had "no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another," such evidence was inadmissible. See id. (citation omitted) (holding that evidence a third party had communicated with victim via a phony MySpace page and was in area on the weekend of the murder was inadmissible as irrelevant when no evidence suggested a motive for the third party to commit murder nor was there any animosity between the two, and the third party did not know where victim lived). Accordingly, the trial court did not abuse its discretion by limiting the Defendant's cross-examination of Mr. Ortega.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE